**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4521-16T3

KIM ALLEN,

     Plaintiff-Appellant,

v.

CAPE MAY COUNTY
and GERALD THORNTON,

     Defendants-Respondents.

_____

Submitted October 31, 2018 – Decided July 17, 2019

Before Judges Fuentes, Accurso and Moynihan
(Judge Accurso dissenting).

On appeal from the Superior Court of New Jersey, Law Division, Cape May County, Docket No. L-0131-15.

Ionno & Higbee, LLC, attorneys for appellant (Sebastian B. Ionno, on the briefs).

Cooper Levenson, PA, attorneys for respondents (Russell L. Lichtenstein, of counsel and on the brief; Jennifer B. Swift, on the brief).

PER CURIAM

Plaintiff Kim Allen appeals from the trial court's order granting summary judgment to defendants Cape May County and County Freeholder Director Gerald Thornton and dismissing her complaint filed under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8. CEPA prohibits an employer from taking "any retaliatory action against an employee because the employee . . . [d]isclose[d] . . . to a supervisor an activity, policy or practice of the employer . . . that the employee reasonably believe[d] . . . [was] in violation of a law, rule or regulation promulgated pursuant to law," N.J.S.A. 34:19-3(a)(1), "or object[ed] to or refuse[d] to participate in any activity, policy or practice which the employee reasonably believe[d] [was] in violation of a law, or a rule or regulation promulgated pursuant to law," N.J.S.A. 34:19-3(c)(1). Plaintiff alleged Thornton did not reappoint her as the County's purchasing agent after the expiration of her term in retaliation for her engagement in three CEPA-protected, whistleblowing activities.

To establish a prima facie claim under CEPA, a plaintiff must demonstrate:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;

A-4521-16T3

(2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c);

(3) an adverse employment action was taken against him or her; and

(4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

[Lippman v. Ethicon, Inc., 222 N.J. 362, 380 (2015) (quoting Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003)).]

Under the burden-shifting analysis applied to CEPA claims, "once [the] plaintiff establishes a prima facie case of retaliatory discharge, the defendant must then come forward and advance a legitimate reason for discharging plaintiff." Zappasodi v. State, Dept. of Corr., Riverfront State Prison, 335 N.J. Super. 83, 89 (2000). If a legitimate reason is proffered, the "plaintiff must raise a genuine issue of material fact regarding whether the employer's proffered explanation is pretextual or whether, the 'retaliatory discrimination was more likely than not a determinative factor in the decision.'" Kolb v. Burns, 320 N.J. Super. 467, 479 (App. Div. 1999) (quoting Bowles v. City of Camden, 993 F. Supp. 255, 262 (D.N.J. 1998)).

The trial court, after finding that plaintiff established a prima facie case and that defendants thereafter articulated legitimate, non-retaliatory reasons for not reappointing plaintiff, concluded plaintiff "failed to present evidence . . .

3

other than her subjective belief, that the County's proffered reasoning is pretextual. Accordingly, summary judgment is appropriate." Notwithstanding that the court found plaintiff established a prima facie case, which required it to find a causal connection existed between the whistle-blowing activity and the County's decision not to reappoint plaintiff, the court confusingly added, "Plaintiff has not shown a causal connection between [her] engagement in alleged CEPA-protected activity and the adverse employment action. Therefore, [d]efendants are entitled to summary judgment dismissing [p]laintiff's claims."

Plaintiff argues the trial court erred because there is "ample circumstantial evidence" to causally link plaintiff's protected activity and defendants' retaliatory action, and by crediting defendants' legitimate reasons which were disputed. We perceive genuine issues of material fact existed as to both the causal connection and defendants' proffered reasons and reverse. See R. 4:46-2(c).

Our Supreme Court has recognized, "as remedial legislation, CEPA should be liberally construed." Lippman, 222 N.J. at 381. Through that lens, we review de novo the evidence presented to the trial court in a light most favorable to plaintiff. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536-37 (1995).

From the record, we glean these facts: plaintiff was provisionally named the County purchasing agent in 2006. After obtaining a certification as a qualified purchasing agent, she was appointed as the County purchasing agent in 2008, a position to which she was reappointed three years later. She was not reappointed in 2014.

Plaintiff alleges she engaged in three instances of protected conduct prior to her non-reappointment. After the County sent out a request for proposal (RFP) for workers' compensation legal services, Jeffrey Lindsay, the director of the County human resources department that prepared the RFP, saw that one firm – which he "liked" – submitted a bid that contained an hourly quote instead of a the preferred "per[-]case quote inclusive of all services up to and including the first day of trial with an hourly rate for all trial time beyond the initial day," as set forth in the RFP. Lindsay approached plaintiff, in the presence of County Counsel Barbara Bakely-Marino, and asked if "there was any way that [the firm] could submit a supplemental proposal or that [the County] could negotiate with them to get a per[-]case quote"; plaintiff told Lindsay the firm could not. Lindsay then asked if the firm could fax a new proposal page to him. Plaintiff told him that would be illegal.

In the second instance, plaintiff allegedly discussed Lindsay's actions with an investigator from a law firm that was conducting an investigation regarding, in part, an RFP to supply pharmaceutical supplies to a County nursing home facility after the administrator, Linda Thornton, and an assistant administrator decided to switch vendors because of negative experience with its current vendor. The law firm's June 4, 2014 report included accounts by plaintiff, Lindsay and Bakely-Marino about the exchange between plaintiff and Lindsay regarding the workers' compensation legal services RFP.[1]

The third alleged CEPA-protected incident involved plaintiff's three objections to the County's engagement of the same law firm that conducted the pharmaceutical RFP investigation. On April 16, 2014, plaintiff complained that the County failed to properly utilize the RFP process in accordance with local public bidding laws when it engaged the law firm. On June 10, 2014, plaintiff told Assistant County Counsel James Arsenault the agenda title, regarding a resolution to engage the law firm, that was being presented to the Cape May County Board of Chosen Freeholders, as well as the related resolution and

---

[1] The copy of the report prepared by the law firm, submitted to us in plaintiff's appendix, is largely redacted. We do not know if the trial court was presented with the same redacted version. The redactions make it difficult to know the scope of the investigation.

A-4521-16T3

proposed agreement with the firm, were not lawful because they did not contain "non[-]fair," "non[-]open" and "not[-]to[-]exceed" language. She also told Arsenault, after he mentioned it was an emergency contract, that the proper process for such contracts was not followed. And on July 16, 2014, plaintiff emailed Thornton, Clerk of the Board of Chosen Freeholders Beth Bozzelli, Director of Operations Michael Laffey and Arsenault, voicing concern that the law firm was being engaged without its completion, ten days prior to the award of the contract, of a political contribution disclosure required under pay-to-play laws. N.J.S.A. 19:44A-20.13 to -22.

The trial court concluded plaintiff established that she reasonably believed the County's conduct violated laws in connection with her exchange with Lindsay regarding the worker's compensation legal services RFP, her disclosure of that exchange to the law-firm investigator, and her objection to the engagement of that firm, thus satisfying the first two prongs needed to establish a prima facie CEPA case. Although defendants now argue in their merits brief that plaintiff did not establish those prongs, they did not cross-appeal; they cannot now challenge the judge's findings and we will not address their contentions. See R. 2:4-2 (requiring submission of a notice of appeal to cross-appeal); see also In re Broderson, 112 N.J. Eq. 532, 533 (1933) ("Unless

specially permitted by statute or rule, an answer to a petition of appeal cannot take the place of a cross appeal.").  Moreover, we determine those prongs were met for the same reasons expressed by the trial court.  We note only that the trial court found that it was

> undisputed between the parties that modifying a bid after it has been submitted violates the [Local Public Contracts Law].  See, e.g., N.J.S.A. []40A:11-23.2 (failing to submit a mandatory component of a bid "shall be deemed a fatal defect that shall render the bid proposal unresponsive and that cannot be cured by a governing body").

Lindsay's alleged conduct involving the alteration of the submitted bid did not violate that statute because the omitted per[-]case quote is not one of the mandatory requirements set forth in N.J.S.A. 40A:11-23.2.  Late submission of the preferred quote would, however, violate our longstanding jurisprudence on the issue.  See George Harms Constr. Co. v. N.J. Tpk. Auth., 137 N.J. 8, 37 (1994) ("Settled principles of public bidding dictate that no material element of a bid may be provided after bids are opened."); see also CFG Health Sys., LLC v. Cty. of Hudson, 413 N.J. Super. 306, 315 (App. Div. 2010) ("These [no-alteration] principles [of public contract law] apply to the initial award of a contract.").

Inasmuch as it is not contested that plaintiff's non-reappointment was an adverse employment action, we focus on whether the evidence shows a genuine issue of material fact as to a causal connection between the protected activity and the non-reappointment. Our analysis compels an assessment of the totality of the circumstances that preceded defendants' decision not to reappoint plaintiff and a discrete review of each of plaintiff's protected activities. Regan v. City of New Brunswick, 305 N.J. Super. 342, 345 (App. Div. 1997).

The trial court accepted defendants' argument that Thornton did not know about plaintiff's protected activities when he made the decision not to reappoint her which "was set in motion at the latest on July 14, 2014," when an email was sent by defendants "indicating that a [Rice] [n]otice would be issued to [p]laintiff."[2] Even if the Rice notice predated plaintiff's July 16 email about the failure to require a political contribution disclosure required under pay-to-play

---

[2]  In Rice v. Union County Regional High School Board of Education, 155 N.J. Super. 64, 70 (App. Div. 1977), we recognized that N.J.S.A. 10:4-12(b)(8) authorized public bodies to discuss personnel matters in executive session "unless all the individual employees or appointees whose rights could be adversely affected request in writing that the matter or matters be discussed at a public meeting[.]"  To give effect to the right to have personnel matters discussed in an open forum, we held that the affected employees must be given advance notice, id. at 74, now commonly known as a Rice notice.

laws, other evidence supported plaintiff's contention that Thornton knew of her protected activity. As the trial court noted:

> Although the chronology shows that the July 14, 2014 [Rice] notice email predates [p]laintiff's July 16, 2014 e[]mail – thus showing it was not a factor in [d]efendant's determination decision – the chronology also shows that the July [14 Rice] [n]otice could have factored in the other objections made by [p]laintiff on April 16, 2014 and June 10, 2014.

Thornton admitted he saw the June 4, 2014 law-firm report which evidenced both plaintiff's exchange with Lindsay and her report of that exchange to the law firm's investigators. That report predated the Rice notice email and, when taken in the light most favorable to plaintiff, provided Thornton with information about those protected activities. Thornton returned from a medical leave at the end of April or beginning of May 2014. The timing of Thornton's review of the report, and what it revealed to him, is a disputed fact. If he diligently reviewed the report after it was authored, he would have known of the activities related to the worker's compensation legal services RFP prior to the issuance of the Rice notice.

The resolution of that timing question will also inform whether the temporal proximity of that revelation to the decision not to reappoint plaintiff is a circumstance that supports an inference of causal connection. See Maimone

v. City of Atl. City, 188 N.J. 221, 237 (2006) (holding the causal connection element "can be satisfied by inferences that the trier of fact may reasonably draw based on circumstances surrounding the employment action. The temporal proximity of employee conduct protected by CEPA and an adverse employment action is one circumstance that may support an inference of a causal connection" (citation omitted)). "Only where the facts of the particular case are so 'unusually suggestive of retaliatory motive' may temporal proximity, on its own, support an inference of causation. Where the timing alone is not 'unusually suggestive,' the plaintiff must set forth other evidence to establish the causal link." Young v. Hobart W. Group, 385 N.J. Super. 448, 467 (App. Div. 2005) (citation omitted) (first quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997); and then quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000)).

Lastly, evidence of the familial and work-related connections between Thornton and Lindsay cannot be ignored. Lindsay was Thornton's stepson. Lindsay's mother, the administrator of the County facility involved in the pharmaceutical RFP investigation, was married to Thornton. In this case, besides the related emails, defendants' evidential support for their contentions that there was no causal connection consisted only of Thornton's testimony that

11                                                          A-4521-16T3

he: was "going back and forth for probably a five or six month period" before deciding to send plaintiff a Rice notice; was unaware of plaintiff's involvement with the worker's compensation legal services RFP; had no memory of reading that portion of the June 4 report regarding plaintiff's exchange with Lindsay; and became aware of plaintiff's objection only after receiving plaintiff's July 16 email. The trial court erred in crediting Thornton's testimony that he did not know about plaintiff's objections to the engagement of the law firm, and that he was informed of the objection only through plaintiff's July 14 email, and failing to consider evidence in a favorable light to plaintiff, especially where credibility is a key issue. Disputed facts should be decided by a jury; they should not form the basis for the grant of summary judgment. Brill, 142 N.J. at 540. The trier of fact should decide if Thornton's claims are believable; his relationship with his stepson and wife may impact that determination.

Direct evidence is not required to support a finding of causal connection. "[A] finding of the required causal connection may be based solely on circumstantial evidence that the person ultimately responsible for an adverse employment action was aware of an employee's whistle-blowing activity." Maimone, 188 N.J. at 238-39. Viewing, as we should, the totality of the circumstances that preceded the adverse employment action, we determine the

12

evidence and all legitimate inferences that can be drawn therefrom favoring plaintiff, present genuine issues of fact and credibility determinations that should be decided by a trier of fact.  R. 4:46-2; Brill, 142 N.J. at 540; see D'Amato v. D'Amato, 305 N.J. Super. 109, 115 (App. Div. 1997) ("A case may present credibility issues requiring resolution by a trier of fact even though a party's allegations are uncontradicted.").

Likewise, in a CEPA pretext case, a plaintiff may defend a summary judgment motion by presenting "some evidence, direct or circumstantial, from which a reasonable factfinder could conclude that defendants' proffered reasons [for its adverse employment action] were 'either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).'"  Kolb, 320 N.J. Super. at 480 (quoting Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 551 (App. Div. 1995)).

We recognized, in the context of Title VII[3] and New Jersey Law Against Discrimination (LAD)[4] cases, once a defendant proffers legitimate, non-discriminatory reasons for its adverse employment action,

> plaintiff need not provide direct evidence that her employer acted for discriminatory reasons in order to

---

[3]  42 U.S.C. §§ 2000e to -17.

[4]  N.J.S.A. 10:5-1 to -49.

survive summary judgment. "She need only point to sufficient evidence to support an inference that the employer did not act for its proffered non-discriminatory reasons." Kelly v. Bally's Grand, Inc., 285 N.J. Super. 422, 432 (App. Div. 1995). In other words, the plaintiff, as the nonmoving party, "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" Fuentes v. Perskie, 32 F.3d 759, 765 (3rd Cir. 1994).

[Kolb, 320 N.J. Super. at 478 (alteration in original).]

see also Donofry v. Autotote Sys., Inc., 350 N.J. Super. 276, 290 (App. Div. 2001) (recognizing "[i]t is beyond dispute that the framework for proving a CEPA claim follows that of a LAD claim. It is also plain that the methods of proof and the applicable burdens in LAD and CEPA cases generally follow Title VII law, and we therefore frequently look to federal as well as state discrimination and retaliation cases as precedent" (citation omitted)). Consistent with the burden-shifting process applied in Title VII and LAD cases, we held, once a defendant proffers legitimate, non-retaliatory reasons for an adverse employment action, "plaintiff must raise a genuine issue of material fact regarding whether the employer's proffered explanation is pretextual or whether, the 'retaliatory discrimination was more likely than not a determinative factor in

14

the decision.'" Kolb, 320 N.J. Super. at 479 (quoting Bowles, 993 F. Supp. at 262).

That is exactly what plaintiff did in opposition to the summary judgment motion. Contrary to the trial court's conclusion, plaintiff provided more than her "subjective belief[] that the County's proffered reasoning is pretextual." See Young, 385 N.J. Super. at 467 (holding plaintiff must provide more than "her own unsubstantiated conclusory allegations" to survive summary judgment).

Defendants' proffered reason for plaintiff's non-reappointment included Thornton's statement that he went "back and forth" for five to six months before deciding to send plaintiff a Rice letter. He also contended plaintiff was a "mediocre employee" and was mistaken in her interpretation of public contracts law; and several department heads had complained about her performance.

These proffered reasons were belied by other evidence. Despite Thornton's contention that he started mulling plaintiff's non-reappointment months before, he admitted he authorized a $1500 expenditure to send plaintiff to a national conference in May 2014 – only two months prior to the date on which the email was sent by defendants "indicating that a [Rice] [n]otice would be issued to [p]laintiff." He also admitted that, although he had the ability to do so, he never disciplined plaintiff or documented any problems or concerns

regarding her performance. Plaintiff denied that any performance issues were brought to her attention during the eight years she was employed. Thornton also deposed that he never documented or memorialized any of the complaints made by other County employees; nor did he specify what the complaints were about except to indicate Bozzelli "said she had difficulties with purchasing as far as writing specs and the RFP proposals." Bakely-Marino testified that for the eight years she served as director of human resources, ending in October 2013, the quality of plaintiff's performance was "excellent." Despite having a disagreement with plaintiff about the handling of the pharmaceutical RFP for the County nursing home, Bakely-Marino testified plaintiff had a better grasp of public contracts law than did she. Arsenault found plaintiff knowledgeable about pay-to-play compliances and, in fact, agreed with her opinion that the law firm was required to submit a contribution disclosure form; he said, "there was nothing incorrect in what she had analyzed for the director." He also testified plaintiff "knew her job. She knew the substance of the statutes that she was interpreting."

We observe that the evidence of defendants' non-retaliatory reasons for not reappointing plaintiff is, like the evidence relating to causal connection, largely testimonial. As such, the witness's motive, bias or prejudice should be

considered in determining if those reasons were credibly advanced. The trier of fact should determine whether Thornton's decision not to recommend plaintiff for reappointment was influenced by: plaintiff's stance on the exchange she had with his stepson; plaintiff's position with regard to the action his wife wanted to take in connection with the pharmaceutical RFP; Bozzelli's complaint – the only specific one made – about plaintiff, considering that Bozzelli was part of his "great staff" and "handled all of [Thornton's] phone calls and all of [his] work" while he was on medical leave to the extent that he "was not bothered at all."

Another factor that must be considered is whether the County employees' complaints about plaintiff were legitimate commentary on her work performance or carping about plaintiff's compliance with public contracting law. This issue was explored during Bakely-Marino's deposition:

> Q. Was [plaintiff] someone who gave off the appearance that she took the rules of compliance seriously?
>
> A. Yes, there was no doubt. Yes. She would follow the absolute letter of the law, even if it killed everybody else, but yes.
>
> Q. Were there times where that bothered or annoyed other people that you became aware of?
>
> A. Yes.

After recounting that plaintiff required the County to stop awarding contracts without competitive bidding, the colloquy continued:

> Q. Did you ever hear or learn of any hostility which was directed towards [plaintiff] because of her insistence on compliance with the statutory obligations?
>
> A. Hostility or what was the other word you used?
>
> Q. I don't know that I did.
>
> A. I'm sorry.
>
> Q. Is there some other word which you would be more comfortable with –
>
> A. Yes.
>
> Q. – to describe a relationship or response?
>
> A. Yes, griping, whining, griping, yes.

The trial court, in granting summary judgment, did not consider this evidence. In that Thornton gave no details about the complaints lodged by other employees – except Bozzelli's which, in a light most favorable to plaintiff, could be characterized as griping and whining – the nature of plaintiff's job called into question the legitimacy of the complaints as a reason for plaintiff's non-reappointment.

We look askance at the trial court's reliance on evidence that the County "largely abided by [p]laintiff's objections" as support for its conclusion that plaintiff failed to establish that defendants' proffered reasons were pretextual. The fact that the County, once told of a violation, followed the law does not negate that they engaged in retaliatory conduct. Even if they obeyed the law – action that could be attributed to plaintiff's CEPA-protected activity – its intent could still be found to be retaliatory. Often those who act as the conscience of the community are disfavored: there was a reason Pinocchio bludgeoned Jiminy Cricket with a hammer.[5]

So too, the end of plaintiff's finite term as purchasing agent – a factor also relied upon by the trial court – does not leave her unprotected from retaliatory action. Employees are entitled to CEPA protection throughout their tenure. The question of timing should be left to the trier of fact.

Viewing the evidence in the light most favorable to plaintiff, we determine a material factual dispute exists as to whether there was a causal connection between defendants' decision not to reappoint plaintiff and her CEPA-related

---

[5] Carlo Collodi, The Adventures of Pinocchio, 24 (Carol Della Chiesa trans., The Floating Press 2009) (1883).

activities, and whether defendants' adverse employment action was motivated, even in part, by her CEPA-protected activities.

Reversed and remanded for further proceedings.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4521-16T3

_____

**ACCURSO, J.A.D., dissenting.**

The majority reverses summary judgment to Cape May County and its Freeholder Director Gerald Thornton on Kim Allen's claim that she was not reappointed to a third three-year term as the Qualified County Purchasing Agent in retaliation for conduct protected under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8. It concludes the Law Division judge erred by resolving disputed issues of material fact in defendants' favor. I disagree. Because I harbor doubts as to whether plaintiff established a prima facie case under CEPA and conclude her claim of pretext relies on speculation and not any evidence she adduced on the motion, I respectfully dissent.

Facts

Defendants made their summary judgment motion after the end of extended discovery, and thus had the benefit of the deposition testimony of all the witnesses likely to be called at trial. Defendants' Rule 4:46-2 statement of undisputed material facts consisted of 122 separately numbered paragraphs, complete with citations to the deposition transcripts, almost all of which plaintiff agreed were not in dispute. The deposition transcripts were also submitted on the motion in their entirety. Because "[a]s is frequently true in employment discrimination claims, our evaluation of the issues can only be understood in

the context of the specific facts in dispute," <u>Tartaglia v. UBS PaineWebber, Inc.</u>, 197 N.J. 81, 90 (2008), I discuss them in detail. Here are the extensive facts adduced on the motion viewed most favorably to plaintiff. All are undisputed unless otherwise noted.

Background

Plaintiff is a political appointee. She was first appointed to a three-year term as the County's Qualified Purchasing Agent in 2008, succeeding Gene Sicilia, who retired after many years in the position. She was reappointed in August 2011. Thus if plaintiff were to be appointed to a third term, she would need to have been reappointed in August 2014.

In 2012, during plaintiff's second term, defendant Thornton became Freeholder Director, succeeding the director who hired plaintiff in 2006 as his confidential assistant and later appointed her to the purchasing position when she obtained her qualified purchasing agent certificate. <u>See</u> N.J.S.A. 40A:11-9. Jeff Lindsay, Thornton's stepson and an attorney, joined the County in October 2013 as Director of Human Resources.

The Workers' Comp RFP

Within months of coming aboard, Lindsay was tasked with reviewing the bids of law firms submitted in response to a request for proposals (RFPs) for

new counsel to represent the County in workers' compensation matters as a member of a three-person evaluation committee. Although an attorney, Lindsay did not have any experience in the area of public contract law. Plaintiff was familiar with the RFP for the workers' comp contract, having been involved in its preparation.

The RFP permitted bidders to submit either an hourly rate at which they would perform the work or a per case quote. Although the bid solicitation permitted either, the County indicated a preference for a per case quote. One of the firms Lindsay liked after reviewing the bids had only bid the contract with an hourly rate. Lindsay telephoned plaintiff and sent her an email, indicating he had a question about the workers' comp RFP.[1] Before plaintiff could return his call, the two saw one another that afternoon, February 25, 2014, at a Freeholders'

---

[1] This was not the only question Lindsay put to plaintiff about the RFP. On an unspecified date after the bids were opened, Lindsay sent plaintiff an email one morning at 2:48 a.m., stating:

> Can't sleep, so I'm reviewing the submissions from workers' comp counsel. Barb [Marino] mentioned interviewing the attorneys, which I think is a great idea. Is there a restriction on me interviewing the attorneys who submitted a proposal? When do we need to decide what attorneys we are selecting? Thanks.

meeting. Plaintiff claims Lindsay asked whether he could "switch out a page by having [the firm] fax to me a proposal page."[2] She responded that to do so would be illegal. She did not recall at her deposition if Lindsay asked whether it was a problem if a firm bid the contract with only an hourly rate, but remembered telling him she would review the RFP to see what advice she could give him. Plaintiff testified at her deposition that County Counsel Barbara Bakely Marino overheard the conversation between herself and Lindsay, remarking "our new attorney does not know Local Public Contracts Law."

Later that afternoon, plaintiff emailed Lindsay with the following message:

> OK, I highlighted the two areas…….I recognize our proposal page has the case load[3] but in the evaluation criteria, page 10, we didn't make it a MUST. We <u>prefer</u> case load as we stated, but what do we know? ;)[4]

---

[2] Lindsay claims he asked whether there was any way the firm could submit a supplemental proposal or if the County could negotiate with the firm to get a per case quote. Because I view "the competent evidential materials presented . . . in the light most favorable to the non-moving party," <u>see</u> <u>Brill v. Guardian Life Ins. Co. of Am.</u>, 142 N.J. 520, 540 (1995), I accept plaintiff's version of the conversation.

[3] Plaintiff testified at deposition she used case load here to refer to a per case fee.

[4] Plaintiff testified at deposition the semicolon and closed parenthesis was "supposed to be a smiley face."

A-4521-16T3

I say we reviewed the RFP and selected a firm that offers an hourly rate and justify strongly. Also, of importance, is knowing if they are assuming they are picking up existing case loads.

Comments?

A few weeks later, plaintiff sent her evaluation report of the responses received to the RFP to Beth Bozzelli, Clerk of the Board of Freeholders, recommending the firm she and Lindsay had discussed based on its "qualifications, experience, references and cost." Specifically, plaintiff wrote the firm's bid

contained all the requested and required documents. Their proposal was thorough and they have over 40 years' workers' compensation defense services. Cost at $140/Hr. and their main office is in Mount Laurel, NJ. References contacted; outstanding, very responsive, the best workers' comp attorneys in NJ; fine reputation with aggressive claims handling.

Plaintiff concluded the firm's proposal "demonstrates a clear understand[ing] of meeting the needs of workers' compensation counsel services for the County of Cape May" and recommended it be awarded the contract.

Plaintiff admits Lindsay did not instruct her to swap out a page in a bid after opening, asking only whether he could do so. She further admits she is not aware of what Lindsay did with the information she provided him. When asked by her counsel at deposition whether she understood Lindsay's inquiry "to be a

5

generalized question about whether a page could be switched out or a course of conduct that he wanted to engage in," plaintiff responded: "A course of conduct." She admits Lindsay raised the issue with her only once, and she is not aware of any similar conduct on his part at any other time.

Nevertheless, the incident concerned her and she discussed it with Gene Sicilia, the former purchasing agent. Plaintiff initially claimed Lindsay approached Sicilia,[5] who had returned to the County as a purchasing assistant after his retirement on a part-time seasonal basis, and asked him whether the page could be switched out. She claimed after that conversation Sicilia told her to "[w]atch that guy. . . . [b]ecause what he was asking was illegal."

Sicilia, for his part, testified at deposition he only spoke to Lindsay at plaintiff's behest. Sicilia claimed plaintiff "told [him] that there was a problem with a bid, and that [Lindsay] wanted to switch a paper or something." Sicilia responded, saying: "You can't do that." He recalled plaintiff was upset, and he asked if she wanted him to talk with Lindsay. Plaintiff asked if he would, so he did. Sicilia claimed he told Lindsay he could not switch out a page after the bids were received, and Lindsay asked whether the County had any other options.

---

[5] In her appellate brief, plaintiff concedes "Sicilia went to Lindsay's office to speak to him" about Lindsay's conversation with plaintiff regarding the workers' comp bid.

Sicilia told him the options were that the County "award it on the merits of the bids that came in" or, if the bid specifications failed to accurately describe what the County needed, that Purchasing could ask the Freeholders to reject all bids and rebid it.

Sicilia testified Lindsay "was fine with that." Sicilia went on to explain that in his view, Lindsay was "simply exploring what could we or what could we not do[.] He's not the purchasing agent, he has never had a purchasing class. He doesn't know the law." He testified he reported back to plaintiff "that I talked with Mr. Lindsay, I explained to him what we were allowed to do and not do, legally. And he was okay with it. And that was it. I moved on to another project." Sicilia denied telling plaintiff to "watch out" for Lindsay, saying he "didn't know him well enough to say anything like that."

Plaintiff admits Lindsay testified he thought the issue was over after he talked to plaintiff at the Freeholder meeting. Lindsay confirmed Sicilia came to his office afterwards, reiterating the advice he got from plaintiff. Plaintiff admits Lindsay testified he did not speak to anyone else about it. She further admits she never raised the issue with Thornton. When asked at her deposition whether she was aware of any facts or evidence to support her claim that telling Lindsay it would be illegal to allow a bidder to switch out a page after bid

7

opening "played a role in the decision not to reappoint [her]," plaintiff responded, "Only that. Only that one instance of the swapping out the page."

The Pharmacy Contract

Shortly after her encounter with Lindsay over the workers' comp RFP, plaintiff got involved in a disagreement over the law governing the award of a pharmacy contract for the County nursing home with County Counsel Marino, herself the daughter of a former Cape May County Freeholder.[6] Linda Thornton, administrator of the nursing home, is married to defendant Freeholder Director Gerald Thornton; Human Resources Director Jeff Lindsay is her son.

After reviewing the proposals from bidders, the nursing home's bid evaluation committee (of which Linda Thornton was not a member) determined to award the contract to a new pharmacy, in part based on the nursing home's negative experience with its existing pharmacy provider, which also bid the contract. When plaintiff reviewed the evaluation reports in preparation for awarding the contract, she noticed the committee had taken the nursing home's prior experience into account in downgrading the incumbent's proposal. Plaintiff advised the evaluators they could not consider past performance in

_____

[6] Marino was appointed as assistant county counsel and later county counsel while her father was a Freeholder. Numerous witnesses, including plaintiff, testified the County does not have any type of anti-nepotism policy.

determining not to award the contract to an incumbent. Accordingly, the evaluators revised their scoring and recommended an award to the incumbent provider with which they were dissatisfied.

On the day the contract award was scheduled to be voted on by the Freeholders, Linda Thornton telephoned County Counsel Marino expressing concern over the award because the nursing home had not been permitted to consider its experience with its incumbent pharmacy provider in awarding the new contract. Shortly before the meeting started, Marino spoke with Freeholder Kristine Gabor, whose portfolio included the nursing home, and Director Thornton and recommended tabling the contract award until Marino could find out why the nursing home had been advised it could not consider prior experience with a bidder in evaluating that bidder's proposal.

The incumbent provider, however, had already been advised by a member of plaintiff's staff that the Freeholders would vote on the recommendation to award it the contract at that meeting. Plaintiff and the incumbent bidder's representative arrived at the meeting at the same time, taking seats near one another as it began. Plaintiff's appearance with the incumbent provider she recommended be awarded the contract, instead of the bidder the nursing home preferred, raised additional concern with the Freeholders about the contract

award.  When plaintiff rose to present the contract award, the Freeholders tabled it without prior notice to her.

Marino subsequently determined the advice plaintiff had provided the evaluation committee about not being able to consider their experience with the current pharmacy provider in evaluating its proposal was wrong.  Plaintiff disagreed with Marino and the two had a loud discussion about it in the office.  Based on Marino's advice, the nursing home revised its evaluation of the pharmacy proposals in accordance with its initial review, and the contract was ultimately awarded to the new vendor the evaluators had first recommended.

Plaintiff, however, despite the legal opinion provided by county counsel, continued to insist her advice to the County nursing home had not been inaccurate.  In a March 25 email to Marino, which she copied to Freeholder Director Thornton, Freeholder Gabor, Clerk of the Board Bozzelli and Mike Laffey, Director of Operations, plaintiff continued to voice her disagreement stating:  "For the record, . . . I respectfully beg to differ, you cannot use past experiences, unless there is documentation to demonstrate prior negative experiences."  Bozzelli responded by asking why prior experience could not be used in this instance when the County had done so for years in other RFPs, prompting plaintiff to offer to copy and circulate the statute on which she based

10

her opinion.  That brought an angry response from Freeholder Director Thornton later that day:  "That is not an answer!!!!  County Counsel interprets the law and statute.  Barb M[arino] has confirmed that past experience can be considered. What a waste of time!!  You're wrong, I'm right, over and over!!!!!!  Barb M[arino] has given a legal opinion accept it."

At her deposition, plaintiff admitted Marino advised her she was "absolutely wrong" that the bidding statute on which plaintiff relied barred the County nursing home from considering "negative prior experience" in the award of the pharmacy contract.  Plaintiff, nevertheless, on the summary judgment motion "[d]enied as stated" defendants' assertion that Marino "determined that plaintiff was referring to a statutory provision that had no application to the process of evaluating a vendor, and that the nursing home could indeed utilize prior negative experience in their evaluation of a bidding vendor," adding: "Bakely-Marino testified that if it had been a bid situation that plaintiff, a non-attorney, would have been right."[7]  Plaintiff admitted at her deposition there was

---

[7]  Marino, asked at her deposition whether she had formed "any opinion as to the correctness of [plaintiff's] position," responded:  "If it was a bid situation as opposed to a competitive contract, she would have been right.  But because it was a competitive contract, I was right."  Marino explained the statute plaintiff thought applied was limited to disqualification of a bidder and did not address evaluation of a responsive bid.

11

nothing illegal in the County nursing home having awarded the pharmacy contract to a new vendor based on negative experience with its existing provider, notwithstanding her initial advice to the contrary.

Following the meeting at which the Freeholders tabled the contract award, Director Thornton asked Lindsay to investigate whether plaintiff had any ties to the incumbent pharmacy provider. Lindsay tasked Al Barnett, the County's risk management investigator, to look into the matter. He interviewed plaintiff, who stated she had no ties to the vendor. After the interview, Barnett submitted a two-and-a-half-page report to Lindsay. Barnett undertook no other investigation into the matter. Although Barnett testified at his deposition he did not state a conclusion in that report, as was his practice, he found no impropriety or appearance of impropriety in plaintiff's involvement in the bid.

At her deposition, plaintiff testified there was nothing wrong with Lindsay, "based on the context of what happened involving this pharmacy RFP, to have directed Mr. Barnett to interview [her]." She acknowledged it would have been Lindsay's responsibility to recommend an investigation were there a concern about an inappropriate relationship between the purchasing agent and a vendor. Plaintiff also conceded Barnett was the appropriate person to have conducted the inquiry, and his questions were focused and in no way

12

inappropriate. Asked at her deposition whether she had any "any facts or evidence that would suggest that anything concerning the pharmacy RFP played a role in the decision not to reappoint you," plaintiff answered "no." Plaintiff likewise testified she had no facts or evidence to suggest the County's investigation of her or the results of the investigation of the pharmacy RFP played a role in the decision not to reappoint her.

The Ballard Spahr Investigation and Contract

By Spring 2014, the relationship between County Counsel Marino and the Freeholders had broken down over Marino's allegations of nepotism involving Lindsay, Director Thornton's stepson. Marino, who had understood Lindsay was being hired as an assistant county counsel reporting to her as opposed to Director of Human Resources, expressed concern about "Lindsay's ability to be unsupervised as a department head." Marino further alleged she was compensated less well than male counterparts had been, and specifically that Lindsay was being paid more than what she was paid when she headed human resources. Finally, Marino asserted she had grown to distrust the members of the Freeholder Board, her client. Marino shared some of her concerns, at least as they related to Thornton and Lindsay, with plaintiff.

13

In March, Assistant County Counsel Jim Arsenault stepped into the rapidly deteriorating relations between Marino and the Freeholders and advised Director Thornton and the Freeholder Board it needed to immediately hire outside counsel with no connection to the County to investigate Marino's allegations.[8]  Arsenault researched several firms, ultimately recommending two to the Board.  The Board determined to retain Ballard Spahr, in part because the partner who would oversee the investigation indicated she could be immediately available to begin work, which Arsenault had advised was critically important.

When Marino told plaintiff, with whom she had a "both social and professional" relationship, that the County had hired a firm to investigate Marino's complaints, plaintiff asked Marino to tell the investigators she also had concerns and wanted to be interviewed.  Plaintiff advised the investigators from Ballard Spahr she was upset about having been "investigated" in connection with the pharmacy RFP at Lindsay's behest.  She also answered their questions about Marino's "concerns regarding Mr. Lindsay's handling of the RFP for workers' compensation claims."  Plaintiff told the investigators Lindsay "questioned whether he could ask a vendor to fax a new proposal after the bid process had

---

[8]  Marino testified at her deposition that she went out on medical leave in the middle of May 2014 and never returned to work.

closed." The report notes "[plaintiff] said absolutely not," and further, that "Ms. Marino said that Mr. Lindsay clearly does not know local public contract law, which scared [plaintiff]."

In their statement of undisputed material facts, defendants asserted the lawyers from Ballard Spahr "were unable to conclude, based on the evidence presented to them by plaintiff, Ms. Marino and Mr. Lindsay, that Mr. Lindsay did anything inappropriate in his handling of the Workers Comp RFP." Instead, they concluded it was "appropriate for Mr. Lindsay to seek counsel regarding processes with which he was unfamiliar." In her responsive fact statement, plaintiff "[a]dmitted that the counsel bought and paid for by the County outside the appropriate protocols found that the County had not engaged in inappropriate actions."[9]

---

[9] As the majority notes, the June 4, 2014 report Ballard Spahr issued to the County of its investigation is very heavily redacted. Only a few lines of the thirty-seven page report, however, appear devoted to the workers' comp RFP, and the complaint about the RFP is attributed to Marino. The report notes Marino's "concerns regarding Mr. Lindsay's handling of the RFP," the investigators' inability "to substantiate the allegations that Mr. Lindsay improperly handled the RFP relating to obtaining new outside counsel for workers' compensation claims," and their conclusion that it was "appropriate for Mr. Lindsay to seek counsel regarding processes with which he is unfamiliar." The most extensive reference to plaintiff appears in a footnote on page nine relating the information plaintiff offered the investigators about her upset over being "investigated" in connection with the nursing home RFP, a subject Ballard

Ballard Spahr's contract with the County was not processed through the Purchasing department but instead was handled by Assistant County Counsel Arsenault. At a bi-weekly meeting of the County's senior staff sometime in April or May,[10] after the first Ballard bills had been submitted, plaintiff asked why the Ballard Spahr contract was not put out to bid if the bills were over $17,500.[11] Shortly before June 10, when the resolution approving the contract was scheduled to be voted on by the Freeholders, plaintiff spoke to Arsenault as the resolution was being drafted to advise it needed to "have non-fair, non-open

appears not to have explored, presumably because of Lindsay's slight involvement and that it was not among the issues Marino raised.

[10] Although plaintiff in her complaint alleges this meeting occurred on or about April 16, 2014, in her answers to interrogatories submitted on the motion, she refers to the same meeting as occurring "[i]n or around May 2014." At her deposition, she testified the meeting was "[i]n the April time period."

[11] N.J.S.A. 40A:11-3(a) permits a local government to award a contract not exceeding $17,500 without public advertising for bids. Professional services contracts for services, such as legal counsel, are, however, exempt from the statute's requirements for public advertising and bid. See N.J.S.A. 40A:11-5(1)(a)(i).

on it"[12] and a "not to exceed figure."[13] Arsenault inserted both into the resolution and the contract. Plaintiff, however, maintains the agenda, which had already been posted, was not amended to note the change.[14]

---

[12] Arsenault explained at his deposition that "non-fair, non-open" is not a statutory term under the Local Public Contracts Law but "a disjunctive that arises because the statute says there is an expectation that public contracts will be awarded in a fair and open process." He testified he believed Cape May County had "designated any contract that deviates from the RFP process as non-fair and non-open." Arsenault further testified the County had adopted the State Comptroller's 2010 "Best Practices for Awarding Service Contracts" designed to "guide governing bodies in their efforts to competitively contract for services" not "awarded solely on the basis of the lowest responsible bid." See http://www.njgov/comptroller/news/docs/service contracts report.pdf.

[13] Plaintiff testified at deposition that Arsenault's administrative assistant "was actually preparing the contract and resolution on her terminal" when plaintiff "walked down" to inquire about the Ballard contract after noticing it on the Freeholders' posted agenda. Plaintiff saw the agreement on the terminal screen and advised Arsenault "[t]he agenda title must have non fair, non open on it, and it must have a not to exceed figure on it." She watched as Arsenault "inserted non fair and non open in the agreement. He didn't have a figure on it, so he inserted a figure of, I believe it was $405 an hour, not to exceed $205,000 if I have that correctly."

[14] Plaintiff asserted at her deposition that the County's failure to amend the agenda item to include the non-fair, non-open language and a not to exceed figure was "illegal," but did not identify any statute or regulation imposing that requirement. Although she referred to a resolution putting "an RFP policy in place," no such resolution is included in the record on appeal. She has also not identified any provision in the State Comptroller's Best Practices she alleges the County violated.

17

Subsequently, plaintiff sent Director Thornton an email on July 16, which she copied to Director of Operations Mike Laffey, Clerk of the Board Bozzelli and Arsenault about her concerns with the June 10 resolution approving the professional services agreement with Ballard Spahr. Arsenault, although acknowledging plaintiff's earlier advice about the wording of the resolution approving the Ballard contract, testified plaintiff's email to Thornton was his first notice that she objected to the process by which Ballard was retained.

In her email to Thornton, plaintiff stated she was concerned that Ballard had not completed "the political contribution disclosure form that was supposed to be completed 10 days prior to the award of the contract." Although plaintiff stated she "underst[ood] the form is being worked on now and will be sent out to [Ballard Spahr] to be completed," she asserted that "[w]hen a contract with a professional services firm exceeds $17,500.00 that [is] not awarded pursuant to a fair and open process, there is a process to be followed for political contribution disclosures." Stating she was "just trying to avoid an audit exposure of future contracts," plaintiff closed by noting the Ballard Spahr contract "did not flow through the Purchasing Dept."

Director Thornton responded to plaintiff's email a few hours later by asking Arsenault to "[p]lease comment on Ballard Spahr." Arsenault sent plaintiff the following twenty minutes later.

> Kim:
>
> In a perfect [world] I agree wholeheartedly with your statements and appreciate the work you've done to ensure pay to play compliance. All I can say with regard to Ballard is that these were exceptional circumstances and we required the services of a law firm with impeccable credentials and no prior connection to the County in order to address very serious concerns. I am confident that Ballard will be able to demonstrate pay to play compliance with the submission of their certifications. While this will come beyond the timetable of the Act I also believe the ends justified the means in this circumstance.
>
> Certainly when time allows for a more deliberate approach to retaining outside counsel, the wisdom of the policies you've highlighted can't be questioned.

Asked about the email at his deposition, Arsenault explained his confidence stemmed from his inquiries with the firm when he vetted them for the retention. He deliberately sought firms out of the area and confirmed those he recommended to the Freeholders had no prior contact with the County. Arsenault also explained he counseled against using one of the firms the County had open contracts with because they would invariably have had contact with

A-4521-16T3

County Counsel Marino and likely with Thornton and others in the County as well. Arsenault testified he was also concerned "that there would be suggestions of a political influence in the process" and thus wanted to ensure a thorough investigation "done by an outfit that had no connection . . . to any fact witness, to any member of the county administration and/or had a current contractual relationship." Arsenault considered the "very serious" allegations Marino leveled against the Freeholders "to be as legitimate a threat to the orderly process of county government as any threat could be" and readily justified an emergency procurement for professional services.

Plaintiff testified at deposition she did not agree with Arsenault that the circumstances justified an emergency procurement. She replied to his email asserting that exceptional circumstances justified Ballard's retention by saying: "I could interpret on any given day situations deemed exceptional but when we are spending taxpayers' dollars to the amount of a quarter of a million that does not justify the fact we didn't RFP the private sector." Arsenault responded to plaintiff, stating: "I understand, but when your house is on fire you don't always have the luxury to comparison shop the price of hoses or check whether the fireman has his licenses in order. Beyond that, like I said, I agree with everything you've done to ensure contract compliance."

Plaintiff testified at her deposition that the County had an RFP in place with two law firms and because the contract would be over $17,500, she "had the responsibility as a purchasing agent and the authority to retain an attorney, knowing that [the County] already had an RFP in place." As part of the record on summary judgment, however, plaintiff admitted she was not aware employers had a legal obligation to promptly investigate complaints implicating the employment laws; she did not know the substance of Marino's complaints, who they involved or "how high up in the [County] the complaints targeted people." She also admitted there are exceptions to the RFP rules, and the decision as to whether something did or did not justify an exception requiring retention of counsel outside the RFP process rested with Arsenault and not Purchasing.

Asked "what facts or evidence do you have that would suggest that anything to do with the Ballard Spahr agreement played a role in the decision not to reappoint you," plaintiff responded: "I pointed out to Gerry Thornton, my manager, that the Pay-to-Play document still had not been completed, and that was in July." Asked "other than having complained, according to your testimony, about issues relating to that contract, what evidence do you have that those complaints played any role in the decision not to reappoint you," plaintiff replied:

21

It was in that July time period, and I received my Rice Notice. And next thing I know, I'm not being reappointed. . . . And I had no performance issues ever documented, no one spoke to me for the months during the pharmaceutical and the Ballard Spahr. Gerry Thornton used to come in my office once a month and talk to me. I hadn't seen him in months.

Thornton's decision to not reappoint plaintiff

Freeholder Director Thornton made the decision not to reappoint plaintiff. He testified at deposition he "had been going back and forth for probably a five or sixth month period" as to whether to reappoint her and had reservations about her performance for an even longer period. Thornton claimed a number of department heads complained to him about working with plaintiff. He, however, never documented any complaints or performance problems. He claimed he did not document the problems because none rose to the point "of taking discipline."[15] Plaintiff testified at her deposition there were no evaluations of employees at the County.

Asked at his deposition whether he "consider[ed] [plaintiff] knowledgeable about public contract laws," Thornton responded, "[n]ot

---

[15] Although not sure of the date, Thornton testified he once, perhaps in 2013, briefly discussed with plaintiff the need to forge better working relations with the department heads. Plaintiff denies she was ever approached by Director Thornton or any other Freeholder about an issue with her performance.

always." Asked to elaborate, Thornton related the mistake plaintiff made with the pharmaceutical RFP. He recalled the incident involved plaintiff "arguing with county counsel" over interpretation of the law governing public contracts, requiring him to step in and say "that county counsel was the one that interprets the law."

Thornton testified he was not aware plaintiff "had voiced any objection that the County was violating its obligations under the public contracting law" before determining not to reappoint her. He explained he was out on medical leave from the end of March to the beginning of May in 2014. He testified he was not aware she worked on a workers' comp RFP in 2014 and was not aware she alleged his stepson "had asked her if he could change out a page in a workers' compensation bid." He did not recall Lindsay ever mentioning anything about it. Thornton testified he was on medical leave when Ballard Spahr was retained and was not involved. Thornton did recall plaintiff sending him an email objecting to Ballard being retained without an RFP, which he sent to county counsel for response.

Thornton admitted seeing the investigation report Ballard issued at the conclusion of its investigation but did not recall the report containing a summary of the firm's interview with plaintiff. He testified he arranged for a <u>Rice</u> notice

to plaintiff because he intended to speak with the Board of Freeholders about not reappointing her in closed session. Bozzelli sent an email directing Arsenault to prepare the notice on July 14. The notice was delivered to plaintiff on July 16, the same day she sent Thornton her email about the Ballard Spahr contract.

Plaintiff admits the July 16 email was the first time she voiced her concerns over the contract to Thornton. Although Thornton testified he had gone back and forth about reappointing plaintiff, he testified he "probably knew . . . for some months" before he returned from leave in May that he "was not going to recommend her reappointment." He testified he did not remember approving her attendance at "a national conference at a cost of $1,500 to the county."

Testimony of the other directors

During the course of discovery, plaintiff deposed Beth Bozzelli, Clerk of the Freeholder Board; Mike Laffey, Director of Operations; and Gene Sicilia, the County's former Purchasing Agent. Plaintiff admitted on the motion for summary judgment that all three testified to complaints about the Purchasing Department when she was the Director.

Bozzelli had been Director of the Department of Aging both before and after plaintiff became the Purchasing Agent. She testified she and other department heads did not get adequate support for their purchasing needs when plaintiff ran the purchasing department. Before plaintiff became the director, the purchasing department was responsible for putting the RFP packets together for the other departments because Purchasing knew what was required. After plaintiff became director, tasks formerly handled by Purchasing, including assembling packets for RFPs, calling around for quotes and processing paperwork, were left to the departments.

Mike Laffey testified to his frustration with Purchasing after plaintiff became the director. Laffey was frustrated with plaintiff when he was Parks Director because she left preparations of an RFP for concessions at the County zoo to him. Laffey felt responsibility for the RFP belonged to plaintiff because her predecessor had always handled the RFP for the Parks Department. He testified the departments were not equipped to prepare their own purchasing documents, leading to delays in important contracts. Laffey also disliked that plaintiff micromanaged some of his expenditures, even when they were "well below the quoted threshold." Laffey testified plaintiff was the least helpful of the three purchasing agents he worked with at the County.

Laffey also testified that as Director of Operations, his approval was required for any seminar an employee wanted to attend requiring a County expenditure. Asked about whether he approved plaintiff attending the New Jersey Association of Counties conference in May 2014 or a $1500 expenditure for her to attend a seminar by the National Institute of Government Purchasing, Laffey replied that he approved "30 a week" and did not recall either one.

Gene Sicilia, who preceded plaintiff as Qualified Purchasing Agent and continued to work as a purchasing assistant on a part-time seasonal basis throughout her tenure, was asked by Director Thornton to temporarily assume plaintiff's duties after her departure. When asked at his deposition if Thornton told him why he had decided not to reappoint plaintiff, Sicilia responded: "Mr. Thornton told me that he was getting complaints from most all of departments that they didn't want to deal with Purchasing or with [plaintiff]."

Sicilia testified that after plaintiff left, he "had to do a lot of fence mending" with the departments. He claimed he visited almost all of the departments and that "each of the department heads with whom [he] [spoke] . . . said that they had had difficulties dealing with purchasing." Asked whether "any of them explain[ed] what those difficulties were," Sicilia replied, "Yeah,

they had a hard time dealing with [plaintiff]. They found her to be kind of my way or the highway."

Marino, who testified plaintiff was "excellent" at her job, conceded she heard other department heads "griping [and] whining" over dealing with plaintiff on purchasing issues. Asked at her deposition whether plaintiff was "someone who gave off the appearance that she took the rules of compliance rather seriously," Marino replied: "Yes, there was no doubt. Yes. She would follow the absolute letter of the law, even if it killed everybody else."

The trial judge's decision

After reviewing those facts against what plaintiff must prove to succeed on a CEPA claim under N.J.S.A. 34:19-3(c)(1)[16] and Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003), in accordance with the burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), the trial judge concluded plaintiff had established her prima facie case but no rational factfinder could determine Thornton's "motivations for not reappointing

---

[16]  The trial judge also analyzed plaintiff's report of Lindsay's question about swapping out a page in the workers' comp RFP to the Ballard Spahr investigators under N.J.S.A. 34:19-3(a)(1), the subsection prohibiting retaliation based on disclosing or threatening to disclose to a supervisor or public body activity by the employer the employee reasonably believes a violation of a law, rule or public policy.

plaintiff resulted from plaintiff's engagement in CEPA-protected activity" or that the reason Thornton claimed for not reappointing plaintiff was simply a pretext for retaliation. See Liberty Surplus Ins. Corp., Inc. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46 (2007) (noting "[t]he inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law'" (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995))). Although I am not convinced plaintiff established a prima facie case of retaliation, I agree with the trial court judge that plaintiff's evidence of pretext is simply too thin to survive summary judgment.

Analysis

Although plaintiff clearly sets forth the three[17] acts she contends constituted CEPA-protected conduct — her objection to Lindsay's "desire to

---

[17] Although it appears as if plaintiff asserted only three instances of CEPA-protected conduct on the motion, she asserts a fourth in her appellate brief — that she "voiced her upset to Ballard Spahr at having been falsely accused of having a personal relationship with a vendor seeking the contract to provide pharmacy services to the County nursing home." Besides not identifying any law, rule or public policy she reasonably believed defendants' violated by such conduct, plaintiff admitted on the motion it would have been Lindsay's responsibility to recommend an investigation; that Barnett was the appropriate person to have conducted the inquiry; and that his questions were not

switch a page in . . . his favored law firm's response" to the workers' comp RFP after bid opening, which she advised was illegal; her report of that incident to the Ballard Spahr investigators; and her "objection to the retention of Ballard Spahr because it had been done outside of the competitive bidding process, without the proper language and conditions in the resolution appointing said firm, and without the proper pay to play documentation having been completed," — she nowhere advises us of the subsection of CEPA under which she prosecuted those claims. It is not identified in her complaint or in her appellate brief. That information is essential to evaluating whether plaintiff could prove her cause of action under CEPA. Plaintiff's failure to identify the subsection of CEPA under which she proceeded in the trial court makes a definitive answer on her prima facie case not possible for two of her three claims.

N.J.S.A. 34:19-3, which defines the three types of employee conduct protected by CEPA, provides that

> [a]n employer shall not take any retaliatory action against an employee because the employee does any of the following:

---

inappropriate. She further testified at her deposition that she had no facts or evidence to suggest the County's investigation of her or the results of the investigation of the pharmacy RFP played a role in the decision not to reappoint her. As plaintiff has, by these admissions, effectively conceded her statements to Ballard on this topic would not support a CEPA claim, I do not consider it further.

a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes: (1) is in violation of a law, or a rule or regulation promulgated pursuant to law, . . .;

b. Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer, or another employer, with whom there is a business relationship, . . .;

c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

   (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . .;

   (2) is fraudulent or criminal . . . ; or

   (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

[See also Estate of Roach v. TRW, Inc., 164 N.J. 598, 610 (2000) (explaining "[t]he Legislature has . . . design[ed] a statutory scheme that protects employees who complain about activities that fall into three basic categories: activities that the employee reasonably believes are in violation of some specific statute or regulation (sections 3a. and 3c.(1)), are fraudulent or criminal (section 3c.(2)), or are incompatible with policies concerning the public health, safety or welfare or the protection of the environment (section 3c.(3)).]

In her brief on appeal, plaintiff repeatedly characterizes her "acts of protected conduct" as "consist[ing] of her objections" to Lindsay's desire to switch out the bid proposal in the workers' comp RFP, her subsequent report of that incident to the Ballard Spahr investigators and her objections to Ballard's retention without public bidding. Having reviewed the record, I think only the first, plaintiff's advice to Lindsay on the workers' comp RFP, is likely actionable on this record, and only if plaintiff brought her complaint under subsection (c)(3).

Plaintiff's subsequent disclosure of Lindsay's conduct to the Ballard investigators does not appear to me independently actionable on the facts, unless, again, plaintiff characterized it as a further "objection" to Lindsay's conduct under subsection (c)(3). Plaintiff's complaints about the manner of Ballard's retention would not, in my view, support a CEPA claim regardless of how she styled her complaint. Further, even if plaintiff could establish a prima facie case of retaliation under CEPA based on one of these three alleged acts of protected conduct, she failed to adduce sufficient proof of pretext to put the County's legitimate, non-retaliatory reason for her non-reappointment in issue, thus making summary judgment dismissing her complaint entirely appropriate.

Taking the three incidents in turn, if plaintiff proceeded under subsection (c)(1) or (3) which protect an employee who "objects to, or refuses to participate" in an activity, she had to have demonstrated as part of her prima facie case that she had an objectively reasonable belief that Lindsay's "desire to switch a page in . . . his favored law firm's response" to the workers' comp RFP after bid opening was "in violation of a law" or "incompatible with a clear mandate of public policy." N.J.S.A. 34:19-3(c); see Maimone v. City of Atl. City, 188 N.J. 221, 231 (2006).

If plaintiff proceeded under subsection (c)(1), her prima facie case would consist of demonstrating (1) she reasonably believed that Lindsay asking her whether he could have the vendor fax a new proposal page to him was a violation of a law, rule, or public policy; (2) her telling Lindsay that what he "desired" to do was illegal constituted a whistleblowing activity; (3) she was not reappointed as the Purchasing Agent; and (4) there existed a causal relationship between her advice to Lindsay and Thornton's decision not to reappoint her. See Dzwonar, 177 N.J. at 462.

Defendants contend plaintiff failed to establish a prima facie case of retaliation in connection with the workers' comp RFP because plaintiff cannot establish she objected to an activity by Lindsay which she reasonably believed

was in violation of the public bidding laws, as he did not engage in any activity beyond asking her a question, which she concedes was not illegal. Defendants further contend plaintiff cannot establish a causal connection between her response to Lindsay's question and Thornton's decision not to reappoint her to a third term.

As the majority notes, "bidders and the public entities that solicit bids are bound by the express terms of the bid proposal. 'Settled principles of public bidding dictate that no material element of a bid may be provided <u>after</u> bids are opened.'" <u>Suburban Disposal, Inc. v. Twp. of Fairfield</u>, 383 N.J. Super. 484, 492 (App. Div. 2006) (quoting <u>George Harms Constr. Co. v. N.J. Tpk. Auth.</u>, 137 N.J. 8, 37 (1994)). Thus plaintiff clearly identified settled law that would prevent the County from awarding a contract based on Lindsay having a bidder fax a new proposal page to him after bid opening. It is less clear to me she set forth facts to support an objectively reasonable belief Lindsay violated that law. <u>See</u> <u>Dzwonar</u>, 177 N.J. at 464.

The trial court judge correctly noted that whether Lindsay actually violated the bidding laws, which he clearly did not, is irrelevant to the analysis under <u>Maimone</u>, because all that is required is that plaintiff "reasonably

believed" Lindsay's activity "violat[ed]" the public bidding laws. 188 N.J. at 231. But Maimone also makes clear

> it is easier for an employee who proceeds under c(3) to prove that he or she reasonably believed the employer's conduct was "incompatible" with a clear mandate of public policy expressed in a law, rule or regulation than to show, as required by c(1), a reasonable belief that the employer's conduct "violated" a law, rule or regulation.
>
> [Ibid.]

Plaintiff, as earlier noted, has not advised us of the subsection of CEPA under which she proceeds. If plaintiff has proceeded exclusively under (c)(1), as it appears from the record before us, I do not believe she could show Lindsay's question to her — could he have a bidder fax a new proposal page to him after bid opening — would support an objectively reasonable belief he had violated the public bidding laws.

Plaintiff admits Lindsay did not ask or instruct her to switch out the page, nor did he do so himself. Plaintiff's proofs do not meet the Dzwonar standard of "facts that would support an objectively reasonable belief that a violation has occurred." 177 N.J. at 464. There is simply nothing in this record from which a factfinder could reasonably infer from Lindsay's question that a violation of the public bidding laws had occurred. Not only did Lindsay not violate our bidding laws, plaintiff could not reasonably believe by his question that he had.

A-4521-16T3

Thus I would conclude, as a matter of law, that plaintiff's belief that Lindsay's conduct violated the public bidding laws under subsection (c)(1) was not objectively reasonable. See Maimone, 188 N.J. at 231.

The trial court, and the majority, conclude plaintiff established the first element of her prima facie case as to the workers' comp RFP because "genuine issues of material fact exist as to whether Lindsay's question was one of mere inquiry or a proposed course of conduct that violates New Jersey's Local Public Contracting Law." Neither the trial court nor the majority, however, cite any case explaining how Lindsay's alleged "proposed course of conduct" could anchor a reasonable belief on plaintiff's part that her co-worker's question constituted a violation of the Local Public Contracts Law under subsection (c)(1).[18]

---

[18] There are cases in which we have held a proposed course of conduct by the employer provided the plaintiff with an objectively reasonable belief that a violation of law was in progress or had already occurred. See Parker v. M & T Chems., Inc., 236 N.J. Super. 451, 452, 455 (App. Div. 1989) (finding CEPA cause of action for in-house lawyer alleging retaliation after objecting to being tasked with overseeing copying and use of misappropriated confidential trade secrets of competitors in employer's possession but not yet examined); Kalman v. Grand Union Co., 183 N.J. Super. 153, 158-59 (App. Div. 1982) (pre-CEPA case reversing summary judgment for employer that terminated pharmacist who objected to, and reported to the Pharmacy Board, supervisor's illegal plan to close pharmacy area of a grocery on July 4, while the rest of the store remained open). But a review of those cases makes clear the plaintiffs based their beliefs

Plaintiff would have an easier time demonstrating that Lindsay's proposed course of conduct was incompatible with a clear mandate of public policy expressed in the public bidding laws under subsection (c)(3). As Judge Skillman, speaking for the Court in Maimone, explained, "[t]o 'violate' a law, a person must commit '[a]n infraction or breach of the law,' but a person's conduct may be found 'incompatible' with a law based solely on a showing that the conduct is 'irreconcilable' with that law." Ibid. (quoting Black's Law Dictionary 768, 1564 (7th ed. 1999)). Plaintiff can readily establish the additional (c)(3) requirement that her complaint involve a matter of public interest, see Turner v. Associated Humane Soc'ys, Inc., 396 N.J. Super. 582, 594 (App. Div. 2007), because "[t]he purpose of competitive bidding for local public contracts is . . . not the protection of the individual interests of the bidders but rather the advancement of the public interest," see River Vale v. R. J. Constr. Co., 127 N.J. Super. 207, 215 (Law Div. 1974).

Although plaintiff could thus likely establish a reasonable belief that Lindsay's "desire to switch a page in . . . his favored law firm's response" to the workers' comp RFP was incompatible with a clear mandate of public policy

on a more extensive course of conduct by their employers than a single question, as here.

under subsection (c)(3), she would still, of course, have to establish the three remaining elements of her cause of action. See Dzwonar, 177 N.J. at 462. I agree with my colleagues that Thornton's failure to appoint plaintiff to a third term as the County's qualified purchasing agent would qualify as an adverse employment action under N.J.S.A. 34:19-2(e). See Nini v. Mercer Cty. Cmty. College, 406 N.J. Super. 547, 556 (App. Div. 2998) (noting that "no functional difference exists between the failure to reappoint at the end of a fixed term and the dismissal of an at-will employee.") (citation omitted). I, however, harbor considerable doubt that plaintiff's response to Lindsay's question — that to proceed as he "desired" would be illegal — fits within the case law as whistle-blowing, especially in light of the email she sent him the same day explaining how he could lawfully justify selection of his preferred firm. See Tartaglia, 197 N.J. at 107 (acknowledging the relevance of the nature of a complaint and the "manner in which it was voiced" in evaluating an employee's claim).

But even were I to accept that plaintiff's response to Lindsay constituted whistle-blowing, I have more difficulty accepting plaintiff adduced facts on the motion to establish a causal connection between her response to Lindsay and Thornton's not appointing plaintiff to a third term. Plaintiff admits she never complained about Lindsay's conduct to Thornton. And there was a five month

gap between Lindsay's question about the workers' comp RFP and Thornton's decision not to reappoint her in advance of the expiration of her term.

While "temporal proximity of employee conduct protected by CEPA and an adverse employment action is one circumstance that may support an inference of a causal connection," Maimone, 188 N.J. at 237, it is not strong support for such an inference here. Because the timing is not "unusually suggestive of retaliatory motive," plaintiff was obliged to "set forth other evidence to establish the causal link." Young v. Hobart W. Grp., 385 N.J. Super. 448, 467 (App. Div. 2005) (citation omitted) (addressing proof of a retaliation claim under the Law Against Discrimination).

The only evidence in the record plaintiff can point to in support of her claim that Thornton was aware of her encounter with Lindsay over the workers' comp RFP is its inclusion in the Ballard Spahr report. Plaintiff asserts her report to the Ballard Spahr investigators constituted a separate instance of protected conduct. Although the trial judge found plaintiff's report to Ballard constituted CEPA-protected conduct under N.J.S.A. 34:19-3(a), plaintiff's claim does not fit neatly under that subsection as Ballard Spahr was neither plaintiff's supervisor nor a public body. See N.J.S.A. 34:19-3(a). Even assuming, however, that Ballard could properly be considered an extension of the

Freeholder Board that retained the firm and thus "a supervisor," the claim suffers the same problem as a claim based on the original exchange under (c)(1). Lindsay's single question to plaintiff cannot support an objectively reasonable belief that Lindsay violated the public bidding laws. In addition, a claim under subsection (c)(3) arising out of plaintiff's report of the incident to Ballard has another problem. Although plaintiff could likely establish an objectively reasonable belief that Lindsay's "desire" to swap out a page in a bid submitted in response to the workers' comp RFP was incompatible with a clear mandate of public policy under subsection (c)(3) when she responded to Lindsay in February 2014, it is harder to accept such belief as objectively reasonable when she spoke to the Ballard lawyers two months later.

Plaintiff testified at her deposition that when she responded to Lindsay at the Freeholders' meeting in February, she did not know what he did with the information, but she agreed with her counsel Lindsay was not asking "a generalized question about whether a page could be switched out" but was instead expressing "a course of conduct that he wanted to engage in." On appeal she argues her impression was reinforced because Lindsay "[a]pparently, unhappy with plaintiff's answer, . . . then went to Gene Sicilia and asked if a page in a proposal received in response to the RFP could be altered."

Leaving aside that Sicilia testified he only spoke to Lindsay at plaintiff's behest and that Lindsay did not approach him, the latter fact plaintiff has conceded, by the time she spoke with the Ballard investigators, the workers' comp contract had already been awarded based on her own recommendation to the Freeholders. Plaintiff knew Lindsay had not acted on his "desire" to swap out the page, and she admitted she had not seen anything in Lindsay's conduct in the ensuing two months to give her any further concern. Because we measure a plaintiff's objectively reasonable belief at the time she blew the whistle, see Mehlman v. Mobil Oil Corp., 153 N.J. 163, 193 (1998), a CEPA claim based on plaintiff's report to Ballard is considerably weaker than the one based on the original incident.

Regardless, however, of whether plaintiff could prove her report to the Ballard investigators was independently actionable under CEPA, it is central to plaintiff's case because it represents her only proof that Thornton was aware of her advice to Lindsay about the workers' comp RFP before he put in motion his decision not to reappoint her. Plaintiff claims the trial court failed to find the report established the causal link between her advice to Lindsay and the non-renewal of her appointment because it usurped the role of the jury in finding credible Thornton's testimony that he did not remember reading of plaintiff's

complaints in the report. The majority accepts the view that the trial court judge impermissibly made credibility findings on the motion. Specifically, the majority concludes "[t]he trial court accepted defendants' argument that Thornton did not know about plaintiff's protected activities when he made the decision not to reappoint her." Ante at 9. I respectfully disagree.

The trial court judge specifically noted Thornton admitted receipt and review of the Ballard Spahr report. Although the judge appropriately acknowledged Thornton's testimony that he did not recall the report including anything about plaintiff's complaint of the workers' comp RFP, the judge did not deem Thornton's testimony credible. He, instead, concluded that Thornton's knowledge of plaintiff's complaint, by its inclusion in the Ballard report, viewed most favorably to her, was insufficient to establish that plaintiff's "objection played a material role in [Thornton's] determination to not reappoint" her, even if it might suffice, because of the closer timing, as evidence of a link between the two events. See Maimone, 188 N.J. at 239 (noting "a finding of the required causal connection may be based solely on circumstantial evidence that the person ultimately responsible for an adverse employment action was aware of an employee's whistle-blowing activity"). Although the majority is critical of the trial judge for finding plaintiff established a prima facie case of retaliation

under CEPA while at the same time "confusingly add[ing]" that plaintiff "has not shown a causal connection between [her] engagement in alleged CEPA-protected activity and the adverse employment action," ante at 4, I think the comment is easily understood in context.

The remark was made at the end of the judge's opinion, just after he concluded that plaintiff had failed to present anything more than her subjective belief that Thornton's reasons for not reappointing her were a pretext for retaliation. In my view, the judge was doing nothing more than acknowledging the obvious; that is, even giving plaintiff the benefit of the doubt on a prima facie showing, meaning she produced some evidence of a causal connection based on the timing of the events, her proofs of a causal connection between any alleged protected activity and her non-reappointment were thin, and she failed to adduce any evidence of pretext, a conclusion I think unassailable on this record. See Donofry v. Autotote Sys., Inc., 350 N.J. Super. 276, 291-92 (App. Div. 2001) (explaining most CEPA cases turn on the fourth element of causal connection and discussing the role of pretext in proving that causal connection or proximate cause in a CEPA case).

Although plaintiff's failure to identify the subsection of CEPA under which she sued makes it impossible to come to any firm conclusion as to whether

she established a prima facie case in connection with the workers' comp RFP, the same is not true regarding her complaints about the Ballard Spahr contract. The record makes clear plaintiff did not establish a prima facie case on the basis of the latter claim, regardless of the subsection of CEPA under which she sued.

First, plaintiff cannot show she engaged in any whistle-blowing conduct related to the contract before her July 16, 2014 email to Thornton complaining about the County's failure to comply with the pay-to-play rules, and certainly none of which she can show Thornton was aware. By her own testimony, plaintiff raised no "objection" to Ballard's retention at the senior staff meeting that took place in April or May. She admitted on the motion she only "inquired as to why the contract with Ballard Spahr was non-fair and non-open and not put out in an RFP." See Tartaglia, 197 N.J. at 109 (noting in the context of a Pierce claim that a "passing remark" to co-workers is not a sufficient expression of a disagreement with an employer's decision or policy to support that the resulting discharge violates public policy). Further, there is no suggestion on this record that Thornton attended that meeting.

Likewise, plaintiff posed no "objection" to the language of the resolution Arsenault drafted approving the contract. Again, by her own testimony, she noticed the item on the Freeholders' June 10 meeting agenda and walked down

to Arsenault's office to advise it needed the "non-fair, non-open" language and a "not to exceed figure." She then watched as Arsenault inserted both in the resolution and the agreement. Although plaintiff asserts the agenda item was not amended, and thus "the public never saw that it was a non fair, non open," she has not identified any law, rule or regulation the County violated by not amending the agenda to insert the language plaintiff thought should be included. Plaintiff's desire to see the public better informed in the absence of any law, rule or regulation does not state a cause of action under CEPA. See Dzwonar, 177 N.J. at 467.

Second, it is undisputed plaintiff sent her July 16 email to Thornton, in which she plainly did object to Ballard's retention without timely compliance of the pay-to-play rules, after he had already arranged to advise his fellow Freeholders of his decision not to renew her appointment. The parties agree plaintiff sent her July 16 email to Thornton the same day she received her Rice notice. But plaintiff conceded on the motion that Thornton had directed Beth Bozzelli to issue the notice two days earlier. As plaintiff sent her July 16 email to Thornton only after he had already set in motion the procedure for not reappointing her, it obviously cannot support her claim it played a part in Thornton's decision. See Tartaglia, 197 N.J. at 125 (noting plaintiffs alleging

retaliatory discharge must show "they engaged in a protected activity <u>known by the employer</u>" and "<u>thereafter</u> their employer unlawfully retaliated against them." (emphasis added)).

Third, and most important, the County's retention of Ballard Spahr was entirely legal, even if the firm filed its pay-to-play disclosure documents late. Plaintiff conceded on the motion that, in addition to the general exemption for professional services, there are exceptions to the public bidding laws for emergency procurements. She admitted she did not know anything about the employment laws and was not aware employers had a legal obligation to promptly investigate complaints implicating them. Moreover, she admitted it was "Arsenault's responsibility to make a decision on whether or not [Marino's complaints] presented such an emergency that the County would simply go out and retain counsel."

Plaintiff testified at deposition she simply did not agree with Arsenault that the circumstances justified an emergency procurement. Her position was that the County "had an RFP in place, and . . . should have used the two existing vendors." Although plaintiff obviously believed the County should not have retained Ballard Spahr outside the usual RFP process, CEPA provides no "remedy for wrongful discharge for employees who simply disagree with an

employer's decision, where that decision is entirely lawful." Young v. Schering Corp., 275 N.J. Super. 221, 237 (App. Div. 1994). Plaintiff's disagreement with Arsenault that the circumstances of Marino's allegations required outside counsel with no prior connections to the County to conduct an independent investigation, instead of turning to the two firms with which the County had open contracts, cannot support a CEPA claim. See Schechter v. N.J. Dep't of Law & Pub. Safety, Div. of Gaming Enf't, 327 N.J. Super. 428, 432 (App. Div. 2000) (finding no CEPA liability in case involving "nothing more than a policy dispute between . . . middle and upper level management"); see also Hitesman v. Bridgeway, Inc., 218 N.J. 8, 33 (2014) ("CEPA is not intended to protect an employee 'who simply disagrees with the manner in which the hospital is operating one of its medical departments, provided the operation is in accordance with lawful and ethical mandates.'" (quoting Klein v. Univ. of Med. & Dentistry of N.J., 377 N.J. Super. 28, 42 (App. Div. 2005))).

Even assuming plaintiff proceeded under a subsection of CEPA that would have permitted her to pursue a claim based on Lindsay's actions in connection with the workers' comp RFP, not apparent on this record, there is no doubt the County articulated a legitimate, non-retaliatory reason for not awarding her a third term. See Donofry, 350 N.J. Super. at 290-92 (explaining a defendant's

intermediate burden of production in a CEPA pretext case). Thornton claimed he did "[n]ot always" find plaintiff sufficiently knowledgeable about public contracts law, and he got complaints from the other department heads that Purchasing, and specifically plaintiff, was difficult to deal with in preparing bid specifications and putting out RFPs.

As to Thornton's concern regarding plaintiff's knowledge of the bidding laws, defendants point to the advice plaintiff gave about the pharmacy contract, which County Counsel Marino deemed incorrect, although plaintiff continues to maintain she would have been correct had the situation been different. Gene Sicilia, the Purchasing Agent who temporarily assumed her duties when she was not reappointed, testified Thornton told him at the time that he did not reappoint plaintiff because of the complaints he got from the departments. Sicilia also testified about the "fence mending" he needed to do with those departments when he stepped back into serving as the County's qualified purchasing agent after plaintiff's departure.

In addition, the two most senior staff in the County, Mike Laffey and Beth Bozzelli, detailed at deposition their complaints about the Purchasing Department under plaintiff's leadership. Both Laffey and Bozzelli testified plaintiff required the departments to assume responsibilities for preparing RFPs

47

and other purchasing tasks formerly handled by purchasing.  They testified the departments often lacked the necessary knowledge to assemble an effective RFP, leading to delays in purchasing necessary goods and services.  Even Marino, who testified plaintiff was "excellent" at her job, admitted she was aware of the "griping [and] whining" by other department heads over dealing with plaintiff on purchasing issues.

Because the County articulated a legitimate, non-retaliatory reason for not appointing plaintiff to a third term, plaintiff, in order to survive summary judgment, needed to identify a genuine issue of material fact putting in issue Thornton's retaliatory intent.  See Kolb v. Burns, 320 N.J. Super. 467, 479 (App. Div. 1999).  Plaintiff could do that directly, by demonstrating her alleged whistle-blowing and not Thornton's concerns and the complaints of the department heads more likely than not motivated Thornton's decision, or indirectly, by proving his proffered reason was a pretext for the retaliation.  See Woods-Pirozzi v. Nabisco Foods, 290 N.J. Super. 252, 274 (App. Div. 1996) (discussing same proofs in a retaliation case brought under the LAD).  Asked time and again at her deposition what "facts or evidence" she had to suggest that any of her alleged acts of whistle-blowing played any role in her not being

reappointed, plaintiff never offered anything beyond the mere fact that she complained.

When counsel followed up by asking about facts or evidence beyond her complaints, she offered nothing other than the timing of those complaints and her Rice notice. Her response to a specific question about the Ballard contract is typical: "I pointed out to Gerry Thornton, my manager, that the Pay-to-Play document still had not been completed, and that was in July." Asked "other than having complained . . . about issues relating to that contract, what evidence do you have that those complaints played any role in the decision not to reappoint you," plaintiff replied:

> It was in that July time period, and I received my Rice Notice. And next thing I know, I'm not being reappointed. . . . And I had no performance issues ever documented, no one spoke to me for the months during the pharmaceutical and the Ballard Spahr. Gerry Thornton used to come in my office once a month and talk to me. I hadn't seen him in months.

Asked if she was suing Thornton individually "because he said you had performance issues, and you didn't have performance issues," plaintiff responded that she was suing him for not reappointing her

> [i]n retaliation for me pointing out to him all the illegal [conduct] — the Ballard Spahr, and I believe in terms of how I feel about this, it started with Jeff Lindsay. And I pointed out to him that [the workers' comp RFP]

49

was being done illegal. I met with [a Ballard Spahr] attorney [who advised there would be] no retaliation. And again, I had no follow-up from anyone, based on my conversation. I had no management talking to me on [the pharmacy RFP] or anything, other than Barb Bakley-Marino, my legal advice.

I agree with the trial court judge that plaintiff offered nothing on the motion beyond "her subjective belief that the County's proffered reasoning [was] pretextual." Plaintiff's contention that no one ever raised performance issues with her ignores, not discredits, Thornton's example of plaintiff's incorrect advice in connection with the pharmacy RFP. See DeWees v. RCN Corp., 380 N.J. Super. 511, 528 (App. Div. 2005) (explaining a plaintiff defeats a motion for summary judgment by either discrediting the employer's reasons for the adverse action or adducing evidence that discrimination was more likely than not a determinative cause). Plaintiff concedes the award of the pharmacy contract was in accordance with the bidding laws, notwithstanding that the nursing home ultimately relied on its adverse experience with the incumbent bidder contrary to her initial advice it could not be done lawfully.

Likewise, although plaintiff contends Thornton never documented her alleged performance issues, he acknowledges they never rose to a level requiring corrective action, and plaintiff concedes the County did not employ performance evaluations. She has not pointed to any evidence suggesting the complaints of

50

the department heads were manufactured or a post hoc rationalization for her non-reappointment. Plaintiff simply failed to adduce any direct evidence of retaliation or "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder <u>could</u> rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" <u>Ibid.</u> (quoting <u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3d Cir. 1994) (citations omitted)).

The only "inconsistency" plaintiff identified was Thornton's approval of plaintiff attending two seminars in the months before the end of her term. Leaving aside that neither Thornton nor Laffey remembered approving them, Laffey testified he approved thirty a week and Thornton's approval is not inconsistent with his testimony that he went "back and forth" as to whether he would appoint plaintiff to a third term. Although the majority criticizes the trial court judge for noting plaintiff's fixed term of appointment, he was not holding her finite term of appointment provided her no protection under CEPA, as the majority suggests. <u>Ante</u> at 19. The judge was, instead, pointing out the weakness in plaintiff's reliance on the timing of her complaints and Thornton's decision to not reappoint her, as Thornton lacked any control over the end date

of plaintiff's term. The judge astutely observed that any event in the last months of plaintiff's term would arguably have temporal proximity to her reappointment, making that connection a particularly slender reed on which to rest her claims of retaliation. See Young v. Hobart W. Grp., 385 N.J. Super. at 467. In that regard, the judge further noted plaintiff was a political appointee hired by a former Freeholder Director, which the judge observed would reasonably affect plaintiff's expectation of a new term in any event.

The majority also misapprehends the import of the complaints by the department heads about plaintiff's leadership of the Purchasing Department. There is no basis for a trial on "whether the County employees' complaints about plaintiff were legitimate commentary on her work performance or carping about plaintiff's compliance with public contracting law." Ante at 17. The issue in this CEPA action is not whether contemporaneous complaints about plaintiff's management of the purchasing department were valid, it is whether they existed as Thornton claimed. Plaintiff cannot discredit Thornton's reasons for not reappointing her by showing he was wrong to heed the complaints. The "issue is whether [retaliatory] animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes, 32 F.3d at 765. It is not unlawful or unreasonable for the County to prefer a qualified purchasing

agent who ensures it follows the public bidding laws without "it kill[ing] everybody else."

The majority sees disputed facts as to whether Thornton read the Ballard Spahr report before deciding not to reappoint plaintiff and, although acknowledging her July 16 email came too late to affect the decision, finds her earlier objections to the Ballard contract may have factored into the decision. Yet there is no proof in this record that Thornton was aware of plaintiff's earlier "objections." And, assuming Thornton was made aware of plaintiff's upset over the pharmacy RFP and Lindsay's question to her about the workers' comp RFP by reading the Ballard Spahr report before he acted on plaintiff's reappointment, which I do because plaintiff is entitled to all legitimate inferences from the proofs viewed most favorably to her, it is not enough, standing alone, to put Thornton's proffered non-retaliatory reasons in issue. The summary judgment standard demands more than "a mere scintilla" of evidence. See Brill, 142 N.J. at 532. Plaintiff's assertion that Thornton retaliated against her for her criticism of his stepson Lindsay and her advice on the pharmacy RFP for the County nursing home of which his wife was the administrator is only her speculation without any factual support in the record. No fair minded jury, in my view,

could find for plaintiff on her CEPA claim on the competent evidence in this record.

The trial judge conscientiously reviewed the undisputed facts, sifted through the evidential materials, separating inferences that could legitimately be drawn from facts in the record from speculation without record support, and determined the competent evidence on causal connection and pretext was so one-sided in defendants' favor that plaintiff could not prevail as a matter of law. See id. at 536. Because I believe the judge was correct in that analysis, and in light of my doubts that plaintiff even established her prima facie case, I would affirm the order dismissing the complaint.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4521-16T3